**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| Nickels and Dimes Incorporated, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:23-cv-00699-CCB-SJF |
| | ) | |
| Noah's Arcade, LLC d/b/a Full Tilt, | ) | |
| Ben Konowitz, and Ryan Hart, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF SUMMARY JUDGEMENT

### I.    Introduction

Plaintiff filed this lawsuit alleging infringement of its service marks TILT and TILT STUDIO under Section 32(1) of the Lanham Act, unfair competition and false designation of origin under Section 43(a) of the Lanham Act, for cybersquatting under Section 43(d) of the Lanham Act, and abandonment of Defendant Noah's Arcade LLC's pending federal service mark applications for the mark FULL TILT and FULL TILT & Design (Statement of Facts at ¶1).[1]

Defendants did not have any knowledge of Plaintiff or Plaintiff's trademarks prior to adopting the FULL TILT and FULL TILT & Design mark and acquiring the domain name www.fulltiltlp.com. (Statement of Facts # 4-9, 47). Immediately upon receipt of Plaintiff's cease and desist letter, Defendants secured advice of counsel and, only then, did Defendants continue their good faith use of the marks in connection with their business. (Statement of Facts # 46, 58). Defendants did not devise a sinister plan, or engage in willful or deliberate conduct, to trade on the reputation of Plaintiff. (Statement of Facts # 12). In fact, the name FULL TILT was randomly selected by a follower of Defendant's Facebook page in connection with a "name the arcade"

---

[1] Plaintiff alleges at ¶1 of the Amended Complaint that their action includes ". . . substantial related claims of trademark infringement and unfair competition and deceptive trade practices under the common laws of the State of Indiana." Plaintiff failed to separately plead any causes of action other than federal trademark infringement and unfair competition, Indiana common law unfair competition, federal cybersquatting, and abandonment of federal of trademark applications.

contest. (Statement of Facts # 10). The marks FULL TILT and FULL TILT & Design and the domain name www.fulltiltlp.com are not confusingly similar to Plaintiff's trademarks.

## II.    Standard of Review

Summary judgment is proper when the moving documents and affidavits, if any, "show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A movant must first show the Court it is entitled to summary judgment. *Cont'l. Cas. Co. v. Northwestern Nat'l. Ins. Co.,* 427 F. 3d 1038, 1041 (7th Cir. 2005). After the movant has met its burden, the nonmoving party must go "beyond the pleadings and set forth specific facts showing there is a genuine issue for trial." *Id.,* Fed. R. Civ. P. 56(e). The Court must consider the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* "A genuine issue of material fact exists when the evidence is sufficient to support a reasonable jury verdict in favor of the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.    Applicable Law
### A.    Federal Trademark Infringement/Federal Unfair Competition

To prevail on a federal trademark infringement claim or federal unfair competitor claim, a plaintiff must be able to show (1) that its mark is protectable, and (2) that the defendant's use of the mark is likely to cause confusion among consumers. *CAE, Inc. v. Clean Air Engineering, Inc.,* 267 F.3d 660, 673-74 (7th Cir. 2001); *AutoZone, Inc. v. Strick,* 543 F.3d 923 (7th Cir. 2008); *Packman v. Chicago Trib. Co.,* 267 F.3d 628, 638 (7th Cir. 2001).

Seven factors comprise the likelihood of confusion analysis: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the

plaintiff's mark; (6) whether actual confusion exists; and (7) whether the defendant intended to "palm off" his product as that of the plaintiff. *AutoZone, Inc.,* 543 F.3d at 929; *CAE, Inc.,* 267 F.3d at 677-78; *Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891 (7th Cir. 2001).

The likelihood of confusion test is an equitable balancing test. No single factor is dispositive and courts may assign varying weights to each of the factors depending on the facts presented. In many cases, however, three of the factors are likely to be particularly important: the similarity of the marks, the defendant's intent, and actual confusion. *Sorenson v. WD-40 Co.,* 92 F.3d 712, 726 (7th Cir. 2015); *CAE, Inc.,* 267 at 677-78; *Barbecue Marx, Inc. v. 551 Ogden, Inc.,* 235 F.3d 1041, 1044 (7th Cir. 2000).

The similarity of the marks must be viewed in the context in which the marks are actually used in the marketplace. *Sullivan v. CBS Corp.,* 385 F.3d 772, 777 (7th Cir. 2004). "Different packaging, coloring, and labeling can be significant factors in determining whether there is a likelihood of confusion." *Packman,* 267 F.3d at 645. When evaluating a mark, we must keep in mind that "[t]he commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail." *GrubHub Inc. v. Relish Labs LLC,* 80 F.4th 835 (7th Cir. 2023). The proper method for comparing the marks is to look at them as a whole, rather than dissecting them into their component parts. *Henri's Food Products Co., Inc. v. Kraft, Inc.,* 717 F.2d 352, 355 (7th Cir. 1983); *AutoZone, Inc.,* 543 at 929-30.

The Seventh Circuit cautions "when the public does not encounter the two marks together, it is inappropriate to focus on minor stylistic differences to determine if confusion is likely." *Essentia Health v. Gunderson Lutheran Health Sys.,* 2017 U.S. District LEXIS 53539 (W.D. Wis. April 7, 2017). When analyzing compound marks, "consumers are generally more inclined to focus

3

on the first word, prefix, or syllable in any trademark or service mark." *Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369, 1372 (Fed. Cir. 2005).

The second factor in the likelihood of confusion analysis, trademark law "prohibits use of a senior user's mark not only on products that are in direct competition with those of the senior user but also on products that are considered to be 'closely related' to the senior user's." *Essentia Health,* 2017 U.S. District LEXIS at *11, *quoting, Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 958 (7th Cir. 1992).

The third factor assesses "whether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *AutoZone, Inc.,* 543 F.3d at 932. "In determining whether the area and manner of concurrent use as between two marks is likely to cause confusion, [courts have noted] that several factors can be important: (1) the relative geographical distribution areas; (2) whether there exists evidence of direct competition between the [services]; (3) whether the [services] are sold to consumers in the same type of store; (4) whether the [services] are sold in the similar section of a particular store and (5) whether the [services are] sold through the same marketing channels." *Ty, Inc.,* 237 F.3d at 900.

The fifth factor in the likelihood of confusion analysis involves the conceptual and commercial strength of a trademark. As for conceptual strength, courts classify marks into five categories of increasing distinctiveness: (i) generic; (ii) descriptive; (iii) suggestive; (iv) arbitrary; and (v) fanciful. *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.,* 149 F.3d 722, 727 (7th Cir. 1998)*; Two Pesos, Inc. v. Taco Cabana Inc.,* 505 U.S. 763, 767 (1992). A descriptive term ordinarily names a characteristic of a product or service. *H-D Mich., Inc. v. Top Quality Serv., Inc.,* 496 F.3d 755, 759 (7th Cir. 2007).The level of protection to which a mark is entitled depends on where it falls on the spectrum of distinctiveness, the least distinctive being the "generic" mark to

4

the most distinctive being the "fanciful" mark. *Two Pesos, Inc.,* 505 U.S. at 768. Regarding consumer strength, the only ways to directly prove the public's evaluation of a mark are through customer testimony and consumer surveys. *Gimix Inc. v. JS & A Grp., Inc.,* 699 F.2d 901, 907 (7th Cir. 1983). The Court may also consider evidence of the frequency of the mark's display and the quantity of advertising dollars used to promote the mark as relevant factors to the mark's strength. *AutoZone,* 543 F.3d at 933. In addition, a party may show the strength of its mark through long-term, continuous use and good reputation. *See Barbecue Marx,* 235 F.3d at 1045.

Regarding the sixth factor in the likelihood of confusion analysis, ". . . the lack of any evidence of actual confusion - after almost two years of Essential Health Clinic's use of that name - weighs substantially against a finding of a likelihood of confusion. *Essentia Health,* 2017 U.S. District LEXIS at *17-18. "The complainant does not need to prove this element with evidence of actual confusion but must provide some type of evidence. *Barbecue Marx,* 235 F.3d at 1045; *see also, Libman Co. v. Vining Industries, Inc.,* 69 F.3d 1360, 1363 (7th Cir. 1995)("Our point is only that is finding of likely confusion can no more be based on pure conjecture or a fetching narrative alone that any other finding on an issue on which the proponent bears the burden of proof").

Regarding the seventh factor in the likelihood on confusion analysis, "passing off" is "trying to get sales from a competitor by making consumers think they are dealing with that competitor, when actually they are buying from the passer off." *Liquid Controls Corp. v. Liquid Control Corp.,* 802 F.2d 934, 940 (7th Cir. 1986). "Mere knowledge of someone's else's mark is insufficient to show intent to pass off." *Sorenson v. WD-40 Co.,* 792 F.3d 712, 726 (7th Cir. 2015); *Sullivan v. CBS Corp.,* 385 F.3d 772, 776-77 (7th Cir. 2004).

**B.**     **Indiana Common Law Trademark Infringement/Unfair Competition**

"The Court analyzes Delta's Lanham Act claims for both trademark infringement and unfair competition together with its claim of common law trademark infringement and unfair competition because the claims are analyzed under the same standard." *Delta Faucet Co. v. Watkins,* 2023 U.S. Dist. LEXIS 18727, 2023 WL 8527092 (S.D. Ind. December 8, 2023)*; Delta Faucet Co. v. Iakovlev,* 2022 U.S. Dist. LEXIS 55185, 2022 WL 900159 (S.D. Ind. March 28, 2022); *Vision Ctr. Nw., Inc. v. Vision Value, LLC,* 673 F. Supp. 2d 679, 683 (N.D. Ind. 2009); *Felsher v. Univ. of Evansville,* 755 N.E.2d 589, 598 (Ind. 2001).

**C.**     **Willful Infringement**

"The Seventh Circuit put it explicitly: 'A good faith junior user is one who begins using a mark with no knowledge that someone else is already using it.'" *Money Store v. Harriscorp Fin., Inc.*, 689 F.2d 666, 674 (7th Cir. 1982)*; "*. . . if defendants in good faith believed they were not infringing plaintiff's trade mark, their continued use of the accused mark would not in itself make them guilty of 'deliberate and willful' infringement." *Square D. Co., v. Sorenson,* 224 F.2d 61 (7th Cir. 1955). "A party who acts in reasonable reliance on the advice of counsel regarding a close question of trademark law generally does not act in bad faith. *Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 958 (7th Cir. 1992).

**D.**     **Anti-Cybersquatting Consumer Protection Act**

To state a claim under the Lanham Act's cybersquatting provision, the plaintiff must allege that (1) it had a distinctive or famous mark at the time the domain name was registered, (2) the defendant registered, trafficked in, or used a domain name that is identical or confusingly similar to plaintiff's mark, and (3) the defendant had a bad faith intent to profit from that mark. 15 U.S.C. § 1125(d)(1)(A). The Seventh Circuit has established that the ACPA has a limited purpose.

6

*uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 435 (7th Cir. 2010) ("Cybersquatting is nothing more than a scheme to defraud businesses. It is not carried out aimlessly or indiscriminately but targeted against the rightful owner in hopes they will pay for the infringing website, rather than incur the costs of going through the courts."); S. Rep. No. 106-140, at 5 (1999) ("Cybersquatting is the practice of registering 'well-known brand names as Internet domain names' in order to force the rightful owners of the marks 'to pay for the right to engage in electronic commerce under their own brand name.'").

Courts have identified two "quintessential example[s]" of bad faith: a defendant "purchases a domain name very similar to the trademark and then offers to sell the name to the trademark owner at an extortionate price," and where a defendant "intend[s] to profit by diverting customers from the website of the trademark owner to the defendant's own website, where those consumers would purchase the defendant's products or services instead of the trademark owner's." *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1058 (10th Cir. 2008). In cases that vary too much from the specific evil contemplated by the ACPA, courts look skeptically at claims of bad faith. "The paradigmatic harm that the ACPA was enacted to eradicate—the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark—is simply not present in any of [Defendant's] actions." *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 810 (6th Cir. 2004).

Congress passed the Anti-Cybersquatting Consumer Protection Act "primarily in an effort to stop 'cybersquatters who register numerous domain names containing American trademarks or tradenames only to hold them ransom in exchange for money.'" *N. Light Tech. v. N. Lights Club*, 97 F. Supp. 2d 96, 115 (D. Mass. 2000).

### E.      Abandonment of Federal Applications

"Fraud in registering a trademark 'occurs when an applicant knowingly makes false, material representations of fact in connection with its application.'" *Jergenson v. Inhale Int'l Ltd.,* 2024 U.S. App. LEXIS 25278 (7th Cir., October 7, 2024)*, citing, In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009). Proving such fraud requires evidence that the applicant 'knowingly made false, material representations of fact in connection with his application.'" *Prime Hookah, Inc. v. M.K. Distrib. Inc.,* 2020 U.S. Dist. LEXIS 270324 *4 (D. Mass. August 7, 2020), *citing, In re Bose Corp.*, 580 F.3d at 1243-44. Several courts of appeals have required "[a] party seeking cancellation of a registered trademark on grounds of fraud to demonstrate the alleged fraud by clear and convincing evidence." *MPC Franchise, LLC v. Tarntino*, 826 F.3d 653, 658 (2d Cir. 2016); *Money Store*, 689 F.2d at 670 ("Fraud will be deemed to exist only when there is a *deliberate attempt to mislead* the Patent Office into registering the mark."). "In order to prevail on their counterclaim, then, Defendants must show by 'clear and convincing evidence' that HK USA's misstatements to the PTO were '(1) made with the *knowledge* of their falsity, and (2) *material* to the determination to grant the application.'" *Oreck Corp. v. Thomson Consumer Elecs., Inc*., 796 F. Supp. 1152, 1159 (S.D. Ind. 1992). "There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party." *In re Bose*, 580 F.3d at 1243.

### F.      Individual Liability of Officers

A corporate officer generally is not individually liable for the actions of the corporation. *York Ctr. Park Dist. V. Krilich,* 40 F.3d, 205, 208 (7th Cir. 1994). "In the absence of some special showing, the managing officers of a corporation are not liable for the infringements of such corporation, though committed under their general direction." *Dangler v. Imperial Mach. Co.,* 11 F.2d 945, 947 (7th Cir. 1926). "It is when the officer acts willfully and knowingly – that is, when

he personally participates in the manufacture or sale of the infringing article (acts other than as an officer), or when he uses the corporation as an instrument to carry out his own willful and deliberate infringements, or when he knowingly uses an irresponsible corporation with the purpose avoiding personal liability – the officers are held jointly with the company." *Id.*

In reaching its finding of no individual liability for officers of a company for patent infringement, the *Dangler* court further explained:

> We conclude that the case is the usual one where a bona fide corporation embarked on a business which it found was covered by numerous patents. A competing concern insisted that it had a patent which covered one of its products. The Maxim Company sought and secured the advice of reputable counsel to the effect that its machine was not an infringement of the competitor's patents. Relying on this advice, the board of directors proceeded with the litigation and with the business. This showing falls far short of establishing any one of the situations for which the officer of the corporation may be held liable for the infringements of the corporation. *Id.* at 948.

## IV.    Argument

### A.    No Individual/Personal Liability for Hart or Konowitz

Plaintiff named the co-owners/officers of Noah's Arcade, LLC, Ryan Hart and Ben Konowitz, in their individual capacities, as additional defendants. (Statement of Facts at ¶1). Defendants first became aware of Plaintiff and Plaintiff's trademarks only *after* receiving a cease and desist letter from Plaintiff's counsel on June 22, 2023. (Statement of Facts # 4-9). The first use of the FULL TILT mark by Noah's Arcade was at least as early as June 10, 2022. (Statement of Facts # 60). The first use of the FULL TILT & Design mark was at least as early as May 10, 2022. (Statement of Facts # 61). Plaintiff's cease and desist letter to Defendants is more than one year after Noah's Arcade first used FULL TILT and FULL TILT & Design. (Statement of Facts #1, 60, 61). Defendants did not have any prior knowledge of the existence of Plaintiff, Plaintiff's business

9

activities, and/or Plaintiff's trademarks before the first use of FULL TILT and the FULL TILT logo. (Statement of Facts # 4-6, 47).

Noah's Arcade, LLC is the owner of the domain name www.fulltiltlp.com. (Statement of Facts # 55). Noah's Arcade acquired ownership of the domain name www.fulltiltlp.com on August 10, 2022. (Statement of Facts #67). Defendants had no prior knowledge of the existence of Plaintiff, Plaintiff's business activities, and/or Plaintiff's trademarks before acquiring the domain name www.fulltiltlp.com. (Statement of Facts # 7-9, 47). Plaintiff's initial communication was sent to Noah's Arcade's email address fulltiltip.@gmail.com on June 22, 2023. (Statement of Facts #1). Defendants then engaged attorney Nicholas Otis for legal advice. (Statement of Facts # 45, 48). Within days of receiving Plaintiff's letter, on June 26, 2023, Attorney Otis responded to Plaintiff, seeking clarification regarding Plaintiff's physical locations, providing relevant district court case law, and requesting that Plaintiff provide any case law supporting its position. (Statement of Facts # 58). On July 9, 2023, Attorney Otis again communicated to Plaintiff's counsel that he had reviewed relevant case law, that confusion was unlikely, that he was confident of non-infringement, and that Noah's Arcade did not intend to change its name. (Statement of Facts # 58). Attorney Otis again invited Mr. Walz to provide case law supporting Plaintiff's position for review. (Statement of Facts # 58). Plaintiff ultimately ignored Mr. Otis and filed its complaint against Defendants. (Statement of Facts # 1). The facts show that Ryan Hart and Ben Konowitz, as officers of Noah's Arcade, immediately sought and secured the advice of counsel regarding Plaintiff's allegations of infringement. (Statement of Facts # 45, 48) and relied on same. Only after securing the advice of non-infringement did Noah's Arcade's continue the use of FULL TILT and the FULL TILT logo. (Statement of Facts # 46).

10

The fact pattern is essentially the same as in the *Dangler* case. Like the defendants in *Dangler*, Defendants received a cease and desist letter from Plaintiff insisting it had rights that covered Defendants use of FULL TILT and FULL TILT & Design. Defendants swiftly sought and secured the advice of counsel to determine whether or not the use of FULL TILT and FULL TILT & Design infringed Plaintiff's rights. (Statement of Facts # 45, 48). Only after securing the advice of counsel, did Defendants continue to use FULL TILT and FULL TILT & Design. (Statement of Facts # 46). The reliance on advice of counsel negates any possibility of willful or deliberate intent to infringe any trademark rights of Plaintiff. *Dangler,* 11 F.2d at 948. As Hart and Konowitz were acting responsibly in their scope as owners/officers in seeking, securing, and following the advice of counsel, they did not act willfully or deliberately, or outside their scope as owners/officers of Noah's Arcade. Plaintiff has not introduced any evidence that Hart and Konowitz knew about Plaintiff or its trademarks prior to adopting and using FULL TILT and FULL TILTE & Design, and/or purchasing the domain name [www.fulltiltlp.com](www.fulltiltlp.com) that would support a finding of willful or deliberate intent. Plaintiff did not introduce any evidence that establishes Hart or Konowitz acted in their personal capacities outside of their scope as officers, or that they used Noah's Arcade to commit willful and deliberate infringements of Plaintiff's trademarks, or that Noah's Arcade is an irresponsible company specifically organized to avoid personal liability. Like in the *Dangler* case, Plaintiff's allegations fall "far short" of establishing individual liability of Hart and Konowitz for any of the causes of action alleged in Plaintiff's Amended Complaint. Defendants therefore respectfully request the Court to enter summary judgment in favor of both Hart and Konowitz on the issue of individual/personal liability for all causes of action alleged by Plaintiff.

**B.     Defendant's conduct does not constitute trademark infringement or unfair competition under the Lanham Act.**

**(1) Similarity between the marks in appearance and suggestion.** Plaintiff's mark, as used in the marketplace, consists of the word TILT in large yellow-colored letters which all appear in the same plane of the paper.



Defendant's mark consists of the stacked wording "FULL TILT" appearing in orange color with a gray video gaming controller positioned in the lower left-hand corner and to the left of the letter "T" in the word "TILT", and with a gray and black skull design positioned in the upper right corner and to the right of the second letter "L" in the word "FULL". The letters of the words "FULL" and "TILT" are angled so that they appear to be going into and emerging out of the plane of the paper. The gray colored video game controller also includes a plurality of circular control buttons appearing in green, red, blue, and dark blue colors. The background of the mark consists of the color blue fading to a darker blue with light blue lighting bolts. The word "FULL" is the first word of the composite mark. The word "TILT" is no more prominent that the word "FULL".



The similarity of between Plaintiff's marks TILT, TILT STUDIO, and TILTED 10 and Defendant's mark FULL TILT must be viewed in the context in which the marks are actually used in the marketplace, and compared in light of what happens in the marketplace and not merely by looking at the two marks side-by-side. *Sullivan,* 385 F.3d at 777. The different stylization and coloring of the respective marks are significant factors in determining confusion when the marks considered in light of their actual use in the marketplace rather than by a side-by-side analysis.

12

*Packman,* 267 F.3d at 645. Plaintiff improperly dissects Defendant's mark into component parts for its confusion analysis. Plaintiff totally ignores significant elements of Defendant's mark which distinguish it from Plaintiff marks. The word TILT is not the dominant portion of Plaintiff's trademarks. (Statement of Facts #37). Plaintiff completely disregards the dominant first word "FULL" word in Defendant's mark and only compares the common word "TILT". Consumers are more likely to focus on the first word "FULL" of Defendant's mark FULL TILT, rather than the suffix word "TILT". *Palm Bay Imps., Inc.,* 396 F.3d at 1372. Plaintiff also disregards the different color schemes of the marks and the video game controller and skull design elements of Defendant's mark. The commercial impression of Defendant's mark FULL TILT is derived from it as a whole, not from its elements separated and considered in detail. *AutoZone, Inc.,* 543 at 929-30. When Defendant's mark FULL TILT is considered as whole, without improperly dissecting the mark into component parts and erroneously limiting the comparison to the common word "TILT", Defendant's mark is different in appearance and sound.

The marks TILT, TILT STUDIO, and TITLED 10 convey different commercial impressions. Defendant Ryan Hart testified that the term "tilt" is a term that is commonly found in pinball and arcade games and that a pinball machine will go into a "tilt mode" or "tilt warning" in response to being shaken by a user. (Statement of Facts # 53). Plaintiff also acknowledges that the term "tilt" is a generic term that refers to a pinball machine stopping play in response to shaking by a player. (Statement of Facts # 36). In the context of pinball machines, the term "tilt" conveys the commercial impression of the user aggressively moving the pinball machine into an angled, inclined, or sloped position causing the machine to stop play. On the other hand, the term FULL TILT refers to something moving at a high speed or a top speed or with maximum energy.

13

Defendants' mark FULL TILT is different in appearance and conveys a vastly different commercial impression than Plaintiff's marks. Therefore factor 1 favors Defendants.

**(2) Similarity of the services.** Plaintiff's services are in the nature of family entertainment centers that include a variety of activities such as video games, pinball games, bumper cars, bowling, mini bowling, games, and virtual reality attractions. In contrast, Noah's Arcade is a traditional game arcade with only pinball machines and video games. Plaintiff's own internet website indicates its evolution and transition away from a simple pinball arcade to family entertainment centers (Statement of Facts #1). Plaintiff's Owner/Chairman Craig Singer recognizes a distinction between traditional arcades having only pinball and video games and family entertainment centers including a variety of attractions. (Statement of Facts # 14). Consumers can easily discern between simple gaming arcades featuring only pinball machines and video game cabinets and entertainment centers offering a comprehensive array of family entertainment services. Factor (2) of the likelihood of confusion analysis favors Defendants.

**(3) Area and manner of concurrent use.** Defendants operate a single physical location arcade in LaPorte, Indiana. (Statement of Facts # 1). Plaintiff previously operated a TILT STUDIO family entertainment center in Indianapolis, Indiana, which is approximately 150 miles from Defendants arcade. (Statement of Facts # 1, 20). This location was closed as of November, 2024. Plaintiff's closest location to Defendants' location is now located in Rockford, Illinois, which is also nearly 150 miles from Defendants' La Porte location. (Statement of Facts 26). Plaintiff testified that it has no plans to expand its business into Northwest, Indiana. (Statement of Facts # 19). The closest "TILT" locations of Plaintiff are located in California and Hawaii, over 2,000 miles and 4,000 miles, respectively, from La Porte. (Statement of Facts #35).

The parties offer their arcade services in different types of business settings. Defendants' arcade is located in a former screw warehouse in a small rural town in Northwest, Indiana. Plaintiff operates its TILT STUDIOS exclusively within shopping malls and plazas. (Statement of Facts #1). Plaintiff has not introduced any evidence that its Indianapolis (now closed) or Rockford locations have lost any customers to Defendants. (Statement of Facts #21, 26). Plaintiff testified revenue decreased at its locations, but could not provide any explanation for this trend (Statement of Facts #25), and did not have any evidence that the decrease in revenue at its Louisville location was due to Defendants' location. (Statement of Facts # 23). Plaintiff also concedes that revenue at their locations is affected by economic downturns. (Statement of Facts # 24).

Ben Konowitz does not have any knowledge that residents of Indianapolis patronized Full Tilt Arcade or whether La Porte is a travel destination of Indiana residents. He has no personal knowledge of anyone making a round trip from Indianapolis to La Porte in one day. (Statement of Facts # 41-44). Plaintiff admitted to not knowing anyone from La Porte County or met anyone from Marion County, has no knowledge of the distance from La Porte to Indianapolis, and has never traveled from Indianapolis to La Porte. (Statement of Facts # 32). Plaintiff has provided no basis of geographic overlap between the parties. Given the distance between Plaintiff's closest location and La Porte, Plaintiff doesn't have any basis to allege that the parties operate in the same or overlapping geographic areas. Moreover, Plaintiff conceded that it never conducted any studies to determine where the customers of TILT STUDIO or TILTED 10 come from and has no knowledge of how far people travel to visit their locations. (Statement of Facts #15), and doesn't have any knowledge of the geographical range of Defendants' customers. (Statement of Facts #16).

The context is key when evaluating the likelihood of confusion factor in "area and manner of concurrent usage". *Barbecue Marx, Inc. v. v. 551 Odgen, Inc.,* 235 F.3d 1041 (7th Cir. 2000). In

15

*Barbeque Marx*, the court made much of the fact that both restaurants were located 1.4 miles apart in neighborhoods within the densely populated city of Chicago. *Barbeque Marx* is instructive for our case, especially since Plaintiff has no locations in the entire State of Indiana and its closest physical location is 150 miles from Defendant. The District Court for the Western District of Wisconsin recently found no likelihood of confusion between ESSENTIA HEALTH & Design and ESSENTIAL HEALTH CLINIC & Design used by unaffiliated health clinics that were separated by 110 miles. *Essentia Health v. Gunderson Lutheran Health Sys.,* 2017 U.S. District LEXIS 53539 (W.D. Wis. April 7, 2017).

The parties operate their respective locations in geographically distant areas. Plaintiff's only location in the State of Indiana permanently closed in November, 2024. Given that the parties operate distant in geographic regions areas, that there is no evidence of direct competition between the parties, and the parties' respective services are sold to consumers in different types of venues, factor (3) of the likelihood of confusion analysis favors Defendants.

**(4) Degree of care likely to be exercised by consumers.** Plaintiff has not introduced any evidence, such as academic, competitive, or marketing studies, consumer surveys, or expert reports, showing the target consumers of Defendants are impulse consumers. Ryan Hart testified that he also had no knowledge whether or not the decision to visit an amusement arcade is made on an impulse basis driven by the desire for immediate entertainment. (Statement of Facts # 52). Plaintiff does not track the socioeconomic status of group visits to its locations (Statement of Fact #17) and therefore is not in a position to opine whether or not Defendants' customers are impulse consumers. Any allegation by Plaintiff that consumers of gaming arcade services are sophisticated purchasers is speculative. Factor (4) of the likelihood of confusion analysis favors Defendants.

**(5) Strength of the Plaintiff's mark.** Plaintiff's trademarks TILT, TILT STUDIO, and TITLED 10 do not possess conceptual strength. Both Plaintiff and Defendant described their understanding of the term "tilt" in association with pinball machine as a stop in play when the machine is shaken by the user. (Statement of Facts # 36, 53).

The term "tilt" merely describes a characteristic of Plaintiff's services. At best, Plaintiff's trademarks may be considered highly suggestive of Plaintiff's services. In either case, Plaintiff's marks are weak as they fall closer to the descriptive or generic categories on the spectrum of distinctiveness, as compared to the arbitrary or fanciful ones.  Because Plaintiff's trademarks are weak, they have a lesser tendency to identify the Plaintiff as the particular source of family entertainment center services. *CAE, Inc.,* 267 F.3d at 684.

Regarding commercial strength, Plaintiff has not introduced any evidence of customer testimony or consumer surveys to directly prove the public's evaluation of its trademarks. *Gimix Inc.,* F.2d at 907. Other than print-outs from its website, there is no evidence of the frequency of the display of Plaintiff's trademarks or the amount of advertising dollars expended by Plaintiff to promote its trademarks. *AutoZone,* 543 F.3d at 933. While Plaintiff has attempted to demonstrate the commercial strength of its mark through evidence of use, it has also not provided evidence of the reputation or goodwill associated with its trademarks. *See Barbecue Marx,* 235 F.3d at 1045.

There are numerous uses of the term "tilt" in connection with pinball arcade services and other pinball related goods in services. Such third-party uses include TILT PINBALL, PERFECT TILT PINBALL, TILTED ARCADE BAR, and ON TILT (Statement of Facts #63). The use of the term "tilt" is diluted by numerous third-party uses in connection with the same or similar goods and services. The diluted nature of the term "tilt" renders Plaintiff's trademarks weak, narrows their scope of protection, and lessens the extent to which Plaintiff may exclude others from using

17

the term "tilt". There are no genuine issues of material fact that Plaintiff's trademarks are not commercially strong. Factor (5) of the likelihood of confusion analysis favors Defendants.

**(6) No Actual confusion.** Plaintiff has not introduced any evidence that Defendant's use of FULL TILT and FULL TILT & Design has caused actual confusion or mistake in the marketplace or among the purchasing public. Plaintiff has not come up with any other type of evidence such as surveys or studies. *Barbecue Marx,* 235 F.3d at 1045. Plaintiff has never been told that Defendants' use of the term FULL TILT is confusing with its trademarks. (Statement of Facts # 27). Plaintiff has no knowledge or evidence that any customer mistakenly went to Defendant's location instead of Plaintiff's locations, (Statement of Facts # 28), and was not able to identify a single person who has gone to Defendants' location as opposed to one of Plaintiff's locations. (Statement of Facts # 29). Plaintiff has no knowledge or evidence that anyone has confused Defendants' location with one of Plaintiff's. (Statement of Facts # 30). Plaintiff conceded that it has no knowledge or evidence that anyone confused Plaintiff's trademarks with Defendants' FULL TILT mark (Statement of Facts # 31). Plaintiff has no knowledge that anyone associated a poor experience at Defendants' location with Plaintiff locations (Statement of Facts # 33) or that Defendants' use of the term FULL TILT has damaged Plaintiff's reputation or negatively impacted the value of its trademarks (Statement of Facts # 34). Plaintiff's lack of any evidence of actual confusion, after more almost two years of Defendant's concurrent use of the mark FULL TILT, weighs substantially against a finding of a likelihood of confusion. *Essentia Health,* 2017 U.S. District LEXIS at *17-18. Factor (6) of the likelihood of confusion analysis favors Defendants.

**(7) Intent of the infringing party to "palm off" his product as that of the other party.** Defendants did not have knowledge of Plaintiff or Plaintiff's trademarks prior to adopting and commencing use of the mark FULL TILT and therefore did not possess the required intent to "palm

off" its services as those of Plaintiff. Defendants adopted the mark FULL TILT in good faith and without prior knowledge of Plaintiff or Plaintiff's trademarks. Defendants indicated that there were no documents relating to its knowledge of Plaintiff or Plaintiff's trademark prior to the filing of this lawsuit. (Statement of Facts #4-9). Other than speculation, Plaintiff has not introduced a single material fact into record that shows Defendants had knowledge of Plaintiff or Plaintiff's trademarks before its good faith adoption of and use of FULL TILT and FULL TILT & Design, or that Defendants that possessed a willful or deliberate intent to adopt the mark FULL TILT specifically to trade on the purported goodwill or reputation of Plaintiff or to "palm-off" its arcade services as those of Plaintiff. The lack of knowledge by Defendants prior to adopting and commencing use of FULL TILT is strong evidence against Plaintiff's unsubstantiated allegation that Defendants acted intentionally to "palm off" their services as that of Plaintiff. Even mere knowledge of someone's else's mark, which is absent in this case, is still insufficient to show intent to pass off." *Sorenson v. WD-40 Co.,* 792 F.3d at 726; *Barbecue Marx*, 235 F.3d at 1046; *Sullivan,* 385 F.3d 776-77. Factor (7) of the likelihood of confusion analysis strongly favors Defendants.

Each of factors 1 to 7 of the likelihood of confusion analysis favor Defendants. Notably, the three likelihood of confusion factors that the Seventh Circuit commonly deems particularly important in the confusion analysis, namely, the similarity of the marks (factor 1), the defendant's intent (factor 7), and actual confusion (factor 6), all strongly favor Defendants. *Sorenson v. WD-40 Co.,* 92 F.3d at 726. Confusion is not likely between the parties' respective trademarks. Defendants' use of FULL TILT and FULL TILT & Design does not infringe Plaintiff's trademarks under the Lanham Act, and Defendant has not unfairly competed with Plaintiff by using the mark FULL TILT in connection with its arcade services. There are no issues of material fact regarding

19

trademark infringement and unfair competition under the Lanham Act and Defendants are entitled to judgement as a matter of law.

### C.      Indiana Common Law Trademark Infringement and Unfair Competition

Plaintiff's common law trademark infringement and unfair competition claims under Indiana law are analyzed under the same standard as trademark infringement and unfair competition under the Lanham Act. *Delta Faucet Co. v. Watkins,* 2023 U.S. Dist. LEXIS 18727, 2023 WL 8527092 (S.D. Ind. December 8, 2023); *CAE, Inc.,* 267 F.3d at 673-674. Because Defendant does not infringe Plaintiff's trademarks and has not unfairly competed under the Lanham Act, Defendant also does not infringe any of Plaintiff's rights under Indiana common law of trademark infringement and unfair competition. There are no issues of material fact regarding common law trademark infringement and unfair competition under the Indiana law and Defendants are entitled to judgement as a matter of law.

### D.      Willful Infringement

Applicant was not aware of the existence of Plaintiff or its trademarks prior to receiving a cease and desist letter from Plaintiff's counsel on June 22, 2003. (Statement of Facts # 4-6, 47). By this time, Defendants had already been using the mark FULL TILT in commerce for one year. (Statement of Facts # 60, 61). Defendant was a good faith junior who began using the mark FULL TILT with no knowledge of Plaintiff's trademarks. *Money Store*, 689 F.2d at 674. Nevertheless, Defendants immediately forwarded the Plaintiff's cease and desist letter to their legal counsel for review. (Statement of Facts # 45). Counsel reviewed the matter and communicated to Plaintiff's counsel that it did not infringe Plaintiff's trademarks. (Statement of Facts # 58). Only after obtaining advice of counsel did Defendants continue the use of the mark FULL TILT. (Statement of Facts # 46). Based on advice of counsel, Defendants in good faith

20

believed they were not infringing Plaintiff's trademarks, and their continued use of the FULL TILT alone does not make them guilty of deliberate and willful infringement. *Square D. Co., v. Sorenson,* 224 F.2d 61 (7th Cir. 1955). There is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law on the issue of willful infringement.

### D.    Defendants have not engaged in cybersquatting

Noah's Arcade, LLC is the owner of the domain name www.fulltiltlp.com. (Statement of Facts # 55). Defendants conducted searches on Google and GoDaddy for fulltilt.com, fulltiltfun.com, and Full Tilt Arcade prior to registering the domain name www.fulltiltlp.com on August 10, 2022. (Statement of Facts # 56). The domain name "www.fulltiltlp.com" is not confusingly similar to Plaintiff's TILT STUDIO mark. 5 McCarthy on Trademarks and Unfair Competition § 25A:51 (5th ed. June 2021 Update) (Under the ACPA, "[i]t is only the challenged domain name and the plaintiff's mark that are to be compared to determine if the accused domain name is confusingly similar.").

In the present case, the allegedly offensive domain and Plaintiff's mark look different, sound different, and have very different commercial impressions. The domain www.fulltiltlp.com is a wholly distinct and independently recognizable phrase, as compared to Plaintiff's mark.  The similarity of the marks must be viewed in the context in which the marks are <u>actually used</u> in the marketplace.  "To determine whether two marks are similar, we view the marks as a whole. We must compare the marks in light of what happens in the marketplace. *Nexus Staffing, Inc. v. Nexus Emp't Sols. of Ind., Inc*., No. 2:20-cv-166-RLM, 2021 U.S. Dist. LEXIS 269591 (N.D. Ind. Nov. 24, 2021) citing *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929-930 (7th Cir. 2008).  Plaintiff's mark almost universally appears as TILT STUDIO over a purple background, as depicted below.



21

Notably, Plaintiff's domain name is www.TiltStudio.com, and Plaintiff's website refers to itself as "Tilt Studio".  In particular, Plaintiff's website states "**Tilt Studios** are action-packed family fun centers, …" and "In addition to the fun, **Tilt Studio** has party rooms for birthdays …" and "**Tilt Studio** can accommodate your event …" and "Admission to **Tilt Studio** is FREE! In order to play games or go on rides, you will need to purchase a **Tilt Studio** Play Card that can be used at all attractions and video games." Given the fact that Plaintiff consistently and intentionally identifies its facilities as TILT STUDIO, uses the domain name www.TiltStudio.com, and expressly refers to itself as "Tilt Studio", it is clear that consumers in the marketplace recognize Plaintiff as TILT STUDIO.  Plainly, the allegedly offensive domain name, www.fulltiltlp.com, does not include the word STUDIO. The word "TILT" is a widely used term of art in connection with pinball games. A "tilt" occurs when a player pushes or nudges a pinball machine too forcefully, resulting in a "tilt" indication that typically has some negative consequence for game play.  In Full Tilt's deposition of Craig Singer, Plaintiff admitted that the term "tilt" means "when you tilt a machine, you – it stops the play, because you're shaking it. (Statement of Facts #36). Such a meaning is absent from the phrase "FULL TILT", which has a dictionary definition of "*to move with as much speed, energy, or force as possible*".

Clearly, the term "tilt" has a very different commercial impression and connotation than the phrase "full tilt".  The commercial impression of a trademark is derived from it as a whole, not from its elements. *Autozone, Inc. v. Strick*, 543 F.3d 923 (7th Cir. 2008). The fundamental inquiry for commercial impression is whether the two marks make the same commercial impression, not whether the two marks are similar in appearance.  *Navistar Int'l Transp. Corp. v. Freightliner Corp.*, 1998 U.S. Dist. LEXIS 20284 (N.D. Ill. Dec. 21, 1998).  In addition, the allegedly offensive domain www.fulltiltlp.com includes the abbreviation "LP" which stands for the city name La Porte

22

(Indiana), where Full Tilt proudly operates its local business.  This abbreviation of the geographic location of Full Tilt's business further distinguishes the allegedly offensive domain from Plaintiff's mark.  Simply put, the overall appearance, sound, and commercial impression of the domain name and Plaintiff's' mark is quite distinct.  Given this undisputed factual record, no reasonable juror could find the domain name is confusingly similar with Plaintiff's' mark.

Defendant lacks the bad faith intent required for cybersquatting. Even assuming *arguendo* that Defendants' domain name and Plaintiff's mark are confusingly similar under §1125(d)(1)(A)(ii), Plaintiff cannot demonstrate that Defendants acted with a bad faith intent to profit. Bad faith intent to profit is a term of art in the ACPA and is not equivalent to bad faith in other contexts. *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1246 (11th Cir. 2009) ("Proving 'bad faith' is not enough. A defendant is liable only where a plaintiff establishes the defendant had a 'bad faith *intent to profit.*' We cannot read the words 'intent to profit' out of the statute." *Id.*

Plaintiff has produced no evidence to support its allegations that Defendants acted with bad faith, and certainly not a bad faith intent to profit.  In particular, Plaintiff has produced no evidence that Defendants made any attempt to sell the domain name www.fulltiltlp.com to Plaintiff or that Defendants have sought remuneration of any kind from Plaintiff (or anyone else) in exchange for any domain name. It is undisputed that Defendants were not even aware of Plaintiff or Plaintiffs trademarks when it registered the domain name www.fulltiltlp.com. Defendants immediately began offering its arcade services in the ordinary course of business after registering the domain name. Plaintiff has not produced any evidence that Defendants provided false contact information when applying for the domain name. Notably, Craig Singer, the Owner of Plaintiff, admitted that Plaintiff has no evidence that any of its facilities lost customers due to FULL TILT's

allegedly offensive domain. Plaintiff also admitted that it is not aware of anyone that went to the FULL TILT arcade instead of Plaintiff's facilities, and it has no evidence that anyone confused FULL TILT with any of Plaintiff's facilities. Not only has Plaintiff failed to produce evidence of a bad faith intent, the undisputed factual record points to the opposite conclusion. Moreover, Defendant owns common law trademark rights in the mark "FULL TILT" and owns pending federal trademark applications for the standard character mark "FULL TILT" and for the stylized FULL TILT logo , and therefore have a legitimate reason to have registered the domain.

The undisputed record reflects that Defendants have common law intellectual property rights in the phrase FULL TILT. In addition, the allegedly offensive domain name includes Defendant's d/b/a, which is registered with the Indiana Secretary of State. There is no evidence of record that Defendants intended to prey on consumer confusion or intercept Plaintiff's customers. Nor is there any evidence in this record that Plaintiff's consumers were diverted away from Plaintiff's website. Defendants' good-faith registration of its domain name does not fall within the sphere of conduct targeted by the ACPA's bad faith requirement. No reasonable juror could conclude that Defendants acted with bad faith intent to profit from Plaintiff's mark. Defendants are entitled to summary judgment as a matter of law on Plaintiff's cybersquatting claim.

E.      **Abandonment of Defendant's Federal Applications is not Appropriate**

Defendant conducted trademark searches on the USPTO and Google for FULL TILT and FILT TILT ARCADE prior to filing its service mark applications with the USPTO. (Statement of Facts # 50). Defendant was not aware of Plaintiff or its trademarks prior to adopting and commencing use of the marks FULL TILT and FULL TILT & Design. (Statement of Facts # 4-9, 47, 51). Defendant secured advice of counsel that it did not infringe Plaintiff's trademarks. (Statement of Facts 45, 46), and filed applications with the USPTO only after securing and advice

from legal counsel. (Statement of Facts #49). Relying on the advice of counsel, Defendant had a good faith belief that its marks FULL TILT and FULL TILIT & Design were not confusingly similar to Plaintiff's trademarks and, therefore, could not have knowingly made any false, material representation of fact in connection with its service mark applications. Because Defendant did not make knowingly false, material representations of fact in connection with its applications, it did not commit a fraud on the USPTO in filing the applications. (Statement of Facts # 59). *Prime Hookah, Inc.,* 2020 U.S. Dist. LEXIS 270324 *4; *In re Bose Corp.*, 580 F.3d at 1243-44. Plaintiff has not met its heavy burden proving that Defendant committed a fraud on the USPTO in connection with the filing of its applications, because there is no clear and convincing evidence that Defendant made knowingly false, material misrepresentations to the USPTO. *MPC Franchise, LLC*, 826 F.3d at 658. Plaintiff has not introduced any evidence that Defendants made a *deliberate attempt to mislead* the Patent Office into registering the marks FULL TILT and FULL TILT & Design. *Money Store*, 689 F.2d at 670. Given the heavy burden of proving fraud on the USPTO by clear and convincing evidence, Plaintiff cannot prove that Defendant made any knowingly false, material statements made to the USPTO in connection with its service mark applications. There is no room for speculation, inference, or surmise and all doubt on this issue must be resolved against Plaintiff. *In re Bose*, 580 F.3d at 1243. There is no genuine issue of material fact that Defendants did not make any knowingly false, material statements to the USPTO in filing of their applications and they are entitled to judgement as a matter of law on the issue of abandonment of their two pending federal service mark applications.

**WHEREFORE,** for the reasons set forth above, Defendants respectfully request that the Court grant Defendants' Motion for Summary Judgment on all counts of the Amended Complaint.

Respectfully submitted,

HUNT SUEDHOFF KEARNEY LLP

By:   /s/ Lyle R. Hardman
Lyle R. Hardman    #16056-49
205 W. Jefferson Blvd, Suite 300
South Bend, IN 46634-4156
Telephone: (574) 232-4801
Email: lhardman@hsk-law.com

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on the 18th day of February 2025, I electronically filed the above and foregoing document with the Clerk of the Courts using the CM/ECF system which sent notification of such filing to counsel of record who are registered with the system.

/s/ Lyle R. Hardman
Lyle R. Hardman    #16056-49

26